Here is the next case, Hernandez-Chacon v. Barr. Good morning. May it please the Court. My name is Heather Axford from Central American Legal Assistance for the petitioner, Sadio Hernandez-Chacon. The facts of this case are not in dispute. The only issue before this Court is whether the near-death beating of Hernandez-Chacon in El Salvador was motivated at least in part on her imputed political opinion or her membership in a particular social group. And we argue for both. When Hernandez-Chacon rejected the sexual advances of a member of the Mara Salvatrucha, she violated two basic norms in Salvadoran society, that the gangs control the population and that it is men, not women, who control sexual relationships. She acted on her right to consent in a country where she has no such right. She did so knowing she was putting herself at risk because, as she said, it was her right to do so. And she was right. Three days later— Is her group all women or all women who are subjected to the unwanted advances by the MS-15? It's a — I would say it's a subset of women. It's specifically women whose noncompliance with gender norms, entrenched gender norms in El Salvador, set them at risk for persecution. How does one identify that group? So I guess the way courts have looked at it in— The problem is no one disputes that—and the good news is that she's gotten relief, at least under the Conventions Against Torture, because the Salvadoran government is incapable of protecting her in her homeland and so she has to come here. The ramifications of her protections are different from asylum and the Conventions Against Torture, and I appreciate that. But we're left with legal standards and writing a standard, and so my problem is that the law tells me that it has to be an identifiable group, and I'm trying to identify—I'm trying to figure out the distinguishing characteristics that allow me to write a standard that says in El Salvador, people that have these characteristics are at risk. Yeah, that's a really good point. And, you know, on page 19 of our brief, we cite to the line of cases, finding that women whose noncompliance with entrenched gender norms set them at risk for persecution do satisfy those requirements. One of the things that the Seventh Circuit looked at in Sarhan was this idea of ostracization, you know, that— Ostracization, yeah, that's it either. That where a woman violates well-entrenched norms, she sets herself up to violate those apart in society. They said, you know, that social stigma causes the violence, that women who are seen as flouting gender norms are ostracized, are seen as outcasts. And I think that making this group of women as outcasts is really important to identifying them as a group. And I think this is especially important in someplace like El Salvador, where we have—you know, we don't have honor killings. So they have the highest rate of femicide in the world with a 90 percent rate of impunity. But what's similar is the fact that impunity for femicide in El Salvador, similarly to honor killings, they're carried out by private actors, but they get away with it because society as a whole accepts and tolerates women who are not sufficiently submissive to men. And this is not just the gangs, not just men, but law enforcement. And that's really  Roberts, why isn't this a matter of general crime? I mean, the conditions are terrible, but that seems to be a general problem. How does this become a particular social group, women who have rejected the sexual advances of a gang member? So I think, I mean— And then is there any evidence in the record that this was a group? So I think—I'll kind of have two parts to that answer. One is specific to Hernández-Chacón's case, is the premeditation, the organization, the severity of the attack against her shows this was not generalized crime, right? The energy that three gang members, two of whom had no prior interaction with Hernández-Chacón, no personal motivation there, the energy that they put to targeting this one woman shows that what she did meant something to them. They wanted to send a message to her. Before they beat her to unconsciousness, they told her, they spit on her, and they said that this was because she won't do things the good way. They wanted her to know that she was being punished for her resistance specifically. But isn't that true of the MS-13 gang generally? Anyone who resists their efforts, whether it be women, whether it be business people who resist their efforts to pay money to them, whether it be people, kids who refuse to join the gang, don't they have the same level of violence and criminality across the board? Anyone who resists any criminal acts that they wish to do, why is this group distinct from every other group that is retaliated against by the gang for refusing to listen to them? Right. I mean, I think that's where the gender norms element comes in here. You know, gangs operate with hegemony over the country, but they're also a very patriarchal organization. And that comes out in this case. And what's important about that is that not just that the gangs are patriarchal, but that violence against women who are not sufficiently submissive is accepted beyond the gangs. It's accepted by the government. It's accepted by society as a whole. Right. I mean, the State Department talks about how the... But this is not a distinct group within the El Salvadorian society, is it? I mean, again, even the report that you rely upon talks about violence against women that's horrific, but it's across the board. In fact, the paragraph beneath the one that you cite regarding retaliation when women resist sexual relations is violence against rival gang members' girlfriends. That if you're a rival gang member's girlfriend, they'll do the same thing to you. So is that another group? Could women who are girlfriends of rival gang members claim asylums because they're a distinct group as well? It's just a separate paragraph in the same report. Yeah, I think, I mean, depending, it's hard, you know, depending on the facts of that case. But I mean, I also, I think what's important here and we, there's a reason also that we led with imputed political opinion here. You know, I mean, that is, I think, a much cleaner analysis because, you know, as you know, just as then Judge Alito recognized in 15 V.I.N.S., which is one of these nonconforming women cases, you know, these could just as easily be seen as feminism, as an opinion against this patriarchal power structure. On the political opinion point, the recent Fourth Circuit case, Alvarez-Lagos, there was expert testimony that the gang would view a refusal to comply with a demand for sex as political opposition. Was there any comparable evidence in this case? We had, you know, more focusing on the defiance of gender norms. But, you know, in the expert testimony of Araceli Bautista Bayona, who was an expert who the judge relied on pretty heavily in, who relied on pretty heavily in granting cat relief, she says that women who violate traditional gender roles are believed to be deserving of punishment. Women who violate gender roles, disobey men, or assert their independence are thought deserving of punishment. And, you know, she doesn't call this political, but where we're talking about the preservation of entrenched hierarchies, of entrenched power structures, that is political. And what I would look to would be the U.N. High Commissioner for Refugees' definition of political, which specifically includes opinions about gender roles and nonconformist behavior, which may cause a persecutor to impute such an opinion to an individual in that case. And so we have this, women who are kind of defiant of these norms, who are not sufficiently submissive, are seen as deserving of violent punishment. And we have an understanding, both in the case of then-Judge Alito, as well as the UNHCR, that that sort of gender dynamic and, you know, statements against the patriarchy are political statements. Thank you. You have some time for rebuttal. We'll hear from the government. Good morning, Your Honors. May it please the Court, I'm Carmel Morgan, on behalf of the Respondent, the U.S. Attorney General. The government asks that you deny the petition for review. The evidence in this case does not compel the conclusion that the petitioner established a cognizable particular social group, nor does it compel the conclusion that she established a nexus to a statutorily protected ground. With regard to the particular social group, the petitioner failed to show that the group she articulated was socially distinct, and she failed to show that it was particular. And because she did not meet both of those requirements, she didn't show that any persecution took place on account of her membership in a particular social group. There was... They rely on the expert declaration to try to show that. I think it's page 300 of the record. Do you want to respond to that? Why isn't that expert declaration some evidence of a distinct group? I think the expert declaration speaks only to general conditions in the country with regard to women, but it doesn't say that, although women are certainly vulnerable to sexual assault in El Salvador, that evidence doesn't say they're socially recognized as a discrete subset within the society, and that is required to establish a particular social group. It doesn't speak to social distinction. There's also the issue of particularity. It's subjective a bit. What might constitute resistance or refusal to comply with a sexual advance, and that term too is a little bit subject to interpretation. I think it would be extremely difficult to determine the boundaries of the group, and so it doesn't satisfy the requirement of particularity. Does that mean that the more repressive a society is towards women, women still aren't able to identify themselves? Say a society that gives a woman no rights whatsoever. She's just chattel. A woman there, just because she happens to be a woman, certainly identifiable, wouldn't be entitled to relief? That's not the argument the government's making in this case. I'm trying to figure out how far the government will ride that horse. I'm just trying to figure it out. I can't speak for the government in that horse. Well, you're speaking for the government right now. Well, yes, but I'm going to speak to the facts of this case, because I'm defending what the government did in this particular case. I'm just trying to understand the underlying logic of what you're saying. Right. It's a valid question. I mean, women are certainly distinguishable, but as you asked counsel, that wasn't the group that was articulated. She didn't argue women as a particular social group. She argued a very specific subset of women that doesn't meet these tests. Whether women itself might, I don't know. Her group would be identifiable if there were additional, I mean, she suffered when she said no, and then she suffered again because she said no. I mean, that's what the record tells us, and she's found to have been credible in that. Isn't the fact that she suffered again because she said no enough to begin to indicate that at least some people were able to identify that she had previously said no? I think it's a permissible inference, permissible, that perhaps she was retaliated against for an imputed feminist ideology. Permissible inference. I'm not even saying feminist ideology, just the fact that an individual prefers to have determination as to with whom and when they have sex. And so, but the trick of it, I don't mean the trick, the difficulty in it becomes being able to say that you can identify who they are and that they've said no and they're punished for having said no, isn't it? Yes. In this case, I think it would be extremely difficult for anyone except the person who had said no and asked to have sex with her and anyone he told about it. I mean, this happened at her home. There weren't witnesses. I don't know how people would know she belonged to that group. She's not subject to social stigma, I don't believe, at least not according to the evidence in the record, because she related. Your opponent made the argument, at least early on, that she was ostracized or would be ostracized because she had said no. And is it your view that the record doesn't support that assertion? Well, I don't know who else knows about her saying no. She didn't tell her sister-in-law about what happened. I just, I don't think that information is out in the community for her to be recognized as part of that group. Why don't you move on to political opinion? With regard to political opinion, again, I think it's a permissible inference that she might have been retaliated against because the gang members assumed that she had some sort of feminist political ideology. But the record doesn't compel that conclusion. And I think the most helpful case here is the Supreme Court's decision in Elias Zacharias. It also involved defiance of a gang. And the way gangs operate, they operate through violence and intimidation. They don't like their authority challenged. And what the Petitioner here failed to do, and also the Petitioner in Elias Zacharias, she failed to show that it was a particular style of defiance and not simply defiance itself that caused the gang or the guerrillas to retaliate. Is there not some evidence that the attackers viewed her resistance as some kind of a political statement and they weren't going to tolerate it? I think you could construe it that way. But the statements made were, I think, if you because you didn't do it the good way, we're going to do it the bad way, and also this is because of what you didn't do. You're back to the it's a permissible inference, but not one that the facts compel. Correct, Your Honor. The standard of review here is substantial evidence, and the government's position is that while it's a permissible inference, it's not compelled in this case. The immigration judge certainly was sympathetic, as also was pointed out. The good news here is no one's trying to make her go back to El Salvador. She's found safety in the United States. Her daughter, I believe, has also been granted some form of relief or protection, so they don't have to go back to the country where they face danger. All right. Thank you. We'll hear the rebuttal. If there are no further questions, we ask that you deny the petition for review. So on the political opinion, the government candidly concedes this is a permissible inference, but the record doesn't compel that conclusion. Yeah. It seems we have a standard of review issue. I appreciate the government's concession. We agree. You know, this ---- Are you arguing that the record compels? No. We're arguing that this Court applies de novo review to mix questions of fact and law and the application of law to undisputed fact, which is what we have in this case. I think you get de novo review. I would also say that the burden, you know, Hernández-Chacón's burden is to show that her opinion that this ---- that her attack was politically motivated is a reasonable one. She doesn't have to show conclusive evidence. She shows direct or circumstantial evidence that make it reasonable that ---- for her to believe that this was a politically motivated attack, and this Court established that in Vumi. I want to give three reasons where I think that her opinion is that this was a politically motivated attack are ---- that makes it reasonable. The first one is the nature of the attack, the premeditation, the organization, the severity of the attack. The energy that these three gang members put into harming her, punishing her, suggests that what she did meant something to them. And they were explicit, and this is point two, the statement that they made, that they were doing this, they were beating her to unconsciousness because she wouldn't, quote, do it the good way. They saw this as punishing her resistance, her disobedience to the sexual demands of one of their cohort, a submission that they believed that he was entitled to. And they wanted her to know why she was being punished. They were sending a message to her, and because they did it in a public place, they were sending a message to everyone else, too. The third point is the participation of the two additional gang members. Right? There was the initial suitor and then these two additional gang members who had no prior interaction with Hernandez-Chacón. The only thing they know about her is her disobedience to one of their cohort. And in that context, I think it is, as the government would say, permissible, I would say reasonable, which is what's required under the law, that they saw her refusal to submit to the sexual demands of one of her, one of the gang members, to, quote, do it the good way, as, or they, it caused them to believe that she held an opinion against the machismo that they believed gave them control over her body, that they believed made their, one of their cohort entitled to her submission. And I think when you take that and you think, take the country conditions where you have accepted, tolerated violence against women like my client who aren't sufficiently submissive, who do believe that they have a right to control over their own body, that's political. And if she's nearly killed for it, that's political persecution. And they wanted her to know that that's why they were hurting her. They didn't rape her. They broke her bones. Thank you. Thank you. We'll reserve decision.